Alberger v. White.

---

ALBERGER *et al.* v. WHITE *et al.*; WAUGH *et al.*, *Interpleaders, Appellants.*

In Banc, June 27, 1893.

1. **Fraudulent Conveyance.** An agreement between a creditor and debtor that a part of a note secured by mortgage and executed by the debtor shall, when collected, be paid back to the debtor in order to prevent his other creditors from having recourse against the mortgaged property for their debts is fraudulent as to such creditors.

2. ———: INSTRUCTION. An instruction on the foregoing issue considered and approved, against the objection that it improperly denied to the interpleader, who was the mortgagee, the right to secure himself against the outstanding indebtedness of a former partnership composed of the interpleader and the mortgagor.

3. ———: ———. An instruction that direct evidence is not required to establish fraud but that it may be inferred from all the facts and circumstances in evidence "in this case" and that if the jury believe certain facts therein hypothecated they shall find there was a fraudulent conveyance, does not decide the issue of fraud as a matter of law and thereby invade the province of the jury.

4. ———: ———. The meaning of an instruction must be gathered from it taken as an entirety.

117 347
59a 383

117 347
129 588

117 347
68a 232

117 347
72a 421

117 347
141 570
74a 42

117 347
149 475
77a 421

117 347
153 610

117 347
159 222

117 347
f 88a 252
89a 310

5. ———: CREDITOR: PREFERENCE. A creditor may take a security for an honest debt from his debtor, although he may know that its effect will be to delay or hinder other creditors of the debtor in the collection of their debts, and although he may also know that the debtor intended to hinder or delay his other creditors, provided the creditor so preferred does not participate in the fraudulent purpose or intent of the debtor.

6. ———: ———: ———: INSTRUCTION. An instruction is proper which tells the jury that if the debtor made the instruments assailed as fraudulent with intent to hinder, delay or to defraud his creditors, and the secured creditor knew this and "participated in such intent" in any manner, the instruments would be void, though the creditor had a valid debt secured thereby.

*Appeal from Randolph Circuit Court.*

AFFIRMED.

*Odon Guitar* for appellants.

(1) Instruction number 2 given at the instance of respondent is erroneous, for the reason that it limits the right of the interpleader, Carlisle, "to take and receive a note, and have it secured by deed of trust on the property of Eugene White for any *bona fide* debt or liability of said White to him" (Carlisle). The main object and purpose of the note and deed of trust was to secure the payment of debts and obligations contracted by the old firm of White & Carlisle (of which interpleader was a member), debts and liabilities due to third parties, and for which the old firm of White & Carlisle were primarily liable. That Carlisle had the unquestioned legal right to secure himself against his "ultimate liability" for such debts there can be no sort of doubt. The bare assertion of the converse furnishes its own refutation. (2) The third instruction given on behalf of respondents usurped the functions of the jury and decided the whole case. *Choquette v. Barada,* 28 Mo. 491; *Leesser v. Boeckhoff,* 33 Mo. App. 233;

*Anderson v. Kincheloe*, 30 Mo. 520; *Fine v. Schools*, 39 Mo. 59; *Rose v. Spies*, 44 Mo. 20; *James v. Jones*, 57 Mo. 138; *Hopper v. Vance*, 27 Mo. App. 336; *Glover v. Duhle*, 19 Mo. 360. (3) The fourth instruction given by the court at the instance of the plaintiff in the attachment is clearly bad, for the reason that it enunciates a proposition which in itself is legally and morally impossible. *Sexton v. Anderson*, 95 Mo. 373..

*W. Gordon, Gordon & Bass, C. B. Sebastian,. S. Turner* and *E. W. Hinton* for respondents.

(1) The court did not err in giving respondents' instructions numbers 1 and 2. The courts of this state have repeatedly held that a conveyance collusively made between debtor and creditor is void as to other creditors, though it covers and includes real indebtedness less than that named in the conveyance. The fact that part of the consideration is false taints the whole transaction. *State ex rel. v. Hope*, 102 Mo. 410; *Kuykendal v. McDonald*, 15 Mo. 420; *Cordes v. Straszer*,. 8 Mo. App. 61; *McNichols v. Rubleman*, 13 Mo. App. 515; *Hanna v. Findley*, 33 Mo. App. 645. (2) Respondents' third instruction correctly declared the law. *Albert v. Besel*, 88 Mo. 154; *Burgert v. Borchert*, 59 Mo. 84. (3) Appellants' third contention is that the fourth instruction on behalf of respondents states a. "proposition, morally and legally impossible." The instruction in substance tells the jury that the deed of trust under which the interpleader claimed was fraudulent and void as to creditors of White, if White executed the same with the intent to hinder, delay or defraud his creditors, and Carlisle had knowledge of and participated in such fraudulent design, whether Carlise had a valid debt secured by said deed of trust or not. *Garesche v. MacDonald*, 103 Mo. 7; *Sexton v.*

*Anderson*, 95 Mo. 373; *Frederick v. Allgaier*, 88 Mo. 603; *Holmes v. Braidwood*, 82 Mo. 616; *Meyerberg v. Jacobs*, 40 Mo. App. 138; *Dearing & Co. v. Collins*, 38 Mo. App. 79; *Nelson Distilling Co. v. Creath*, 45 Mo. App. 169. (4) Instructions themselves correct will not afford grounds for reversal because they authorize a verdict for plaintiff on his theory of the case without embracing in the same instruction defendants' theory of the case, where the defendants did or could present instructions embracing his theory. *State ex rel. v. Hope*, 102 Mo. 426; *Owen v. Railroad*, 95 Mo. 169; *Daugherty v. Railroad*, 97 Mo. 647; *Nelson Distilling Co. v. Creath*, 45 Mo. App. 169.

GANTT, J.—In a suit by attachment instituted by respondent in the circuit court of Boone county against Eugene White, among several other creditors, a stock of goods, wares and merchandise and other property was levied upon, which theretofore, on the seventeenth of May, 1889, had been conveyed by deed of trust by the said White to J. H. Waugh to secure the payment of a promissory note of $4,000 of that date to James A. Carlisle. The said Waugh and Carlisle interpleaded in said suits, claiming the property under said deed of trust. The respondent answered, admitting the execution of said deed of trust, but charging that the same was executed for the purpose of hindering, delaying and defrauding the respondent and other creditors of the said Eugene White, and to secure an amount largely in excess of any *bona fide* indebtedness from the said White to the said Carlisle. Upon this answer issue was joined by the interpleaders, the issue submitted to the jury and found for the respondents, and the interpleaders appealed.

The undisputed facts are that, prior to the thirtieth day of January, 1889, the said Carlisle and one C. Meade White, a brother of the said Eugene White, were engaged in the merchant tailoring business in the city of Columbia, under the firm name of White & Carlisle; that on that day Eugene White, under the firm name of Eugene White & Co., purchased all the interest of the said Carlisle in said concern of White & Carlisle for the sum of $4,000; $1,518.55 to be paid in cash, $500 by note payable one day after date, and the remainder, $1,981.45, in the accounts due the firm of Carlisle & White, the said Eugene White, by the firm name of Eugene White & Co., further agreeing to stand half the losses on all accounts of Carlisle & White not collected; losses to be adjusted on the first of May, 1889, and to assume all liabilities of said concern and to have all bills not due against said firm transferred to account of Eugene White & Co.; that, contemporaneously with this purchase, Eugene White also bought all the interest of his brother, the said Meade White, in said concern, for which he gave his brother his note for the sum of $1,800; that the cash payment was made to Carlisle; the note of Eugene White for $500, executed and delivered to him and the accounts of Carlisle & White transferred to him; and the accounts of creditors for goods sold, including that of respondent against the firm of White & Carlisle, transferred to account of Eugene White & Co., at the request and on the representations of Eugene White.

The following letter from respondents, received by Eugene White, was shown to Carlisle:

"PHILADELPHIA, February 13, 1889.
*Mr. Eugene White, Columbia, Mo.*

DEAR SIR: Yours of the eighth received and appears satisfactory. On the strength of your statement we have decided to transfer the account of White

& Carlisle to Eugene White & Co., thus releasing Mr. Carlisle from any pecuniary responsibility. We trust our dealings may be mutually satisfactory.

Yours truly,

ALBERGER, STOER & Co."

The main witness for the intervenors was Carlisle. His evidence tended to show that it was his understanding that Meade White remained a member of the firm of Eugene White & Co.; that on the same day the written agreement was signed evidencing the sale aforesaid, to-wit, the thirtieth of January, 1889, Eugene White executed and delivered to him a note in the name of Eugene White & Co., of that date, payable one day after date, for the sum of $6,000; that said note was taken as collateral security for the performance by the said Eugene White & Co. of their obligations under said contract, which were estimated to be about that amount; that, about the first of May, Eugene White & Co., having failed to pay the debts of White & Carlisle, which they had assumed, and being himself pressed for payment of one of those debts of about $2,000, due the Exchange National Bank, he placed the note for $6,000 in the hands of his attorney; that suit was brought on it in the circuit court of Audrain county, in which county Meade White lived; that on the seventeenth of May he had an adjustment with Eugene White of the accounts between himself and the firm of Eugene White & Co., under said contract, which resulted in the execution by the said Eugene White in the name of Eugene White & Co. of the note for $4,000, secured as aforesaid by the deed of trust under which intervenors claim; that said note was given for the balance approximately ascertained by an estimate of the liabilities of said Eugene White & Co., to Carlisle on the first of May under the contract as per the following account.

EUGENE WHITE & Co.,

    In Account with J. A. CARLISLE:

1889, May 1.—To purchase price of goods as per contract,
    January 30, 1889..........................;.....................$4,000 00
Interest on same, three months, 8 per cent...... ..............     80 00
To liabilities as per said contract assumed by White & Co., and
    not discharged per contract.
Alberger, Stoer & Co......................... ....................$ 584 00
To note at Exchange Bank... ...........................  2,000 00
To interest on note at Exchange Bank..... ........ ..........     42 72
To rent to Trimble..... ...... ......... ..................    250 00
To balance cash advanced............................:............   160 85
To error in charging L. S. Gordon's account to Carlisle...... ..    37 50
To error in charging Reynolds' account to Carlisle......... ...     45 00
To probable repairs of store as per contract......... ..........    50 00

                                                         $7,250 07
                        CREDITS.

January 30.—By cash on contract.................. $1,518 55
By interest on same, 3 months, 8 per cent... ........     30 37
By accounts collected on contract............. ......  1,430 51
By one-half losses on account, as per contract.........   234 22

                                                         $3,313 65

    To balance................ ....................... ...$4,036 43

That after the execution and delivery of the note
for $4,000 and the deed of trust, the suit on the note
for $6,000 was dismissed.

The principal witness for respondents was Eugene
White, who testified that all the accounts of the cred-
itors for goods against the firm of White & Carlisle
were transferred to the account of Eugene White &
Co., and that about the middle of February he showed
the letters of such creditors to Carlisle, advising him
of that fact; that he executed the note to Carlisle for
$6,000 on the twenty-seventh or twenty-eighth day of
February, but dated it on the thirtieth of January, the
day of the consummation of the trade.

"Q. At that time, what amount of money did you
actually owe Carlisle? A. By assumption I owed him

the $2,000 note at the Exchange bank, my personal note for $500, and about $158 that he had loaned me, making a total of about $2,600. This was all I owed him.

"*Q.* If you only owed Carlisle $2,600, why did you execute him a note for $6,000? *A.* We had talked the matter over and had come to an understanding about the thing, and agreed that if the note was made for that amount I should, if I got into any trouble, have the balance of the money myself, over and above his amount. That is, if I should fail in business or in any way have trouble and need the money, I should have the balance of the note, over and above the amount I owed him. I was to get the surplus, in other words.

"*Q.* Who were you to get it from? *A.* From Mr. Carlisle. He would close the trade and I should have the balance of the money. In other words, if anybody got left it would be the eastern creditors, but he and I would be safe.

"*Q.* What did he say to you regarding this transaction? *A.* He said that 'if anybody had to stand any loss on account of it I think it had better be the eastern creditors, for they are better able to afford it than we are. We will fix ourselves first; I will protect you, and if anybody has to lose anything it will be them.'

"*Q.* That was the arrangement and understanding between you, was it? *A.* It was.

"*Q.* What became of the $6,000 note? *A.* Mr. Carlisle has it now. After I bought out the firm of White & Carlisle I conducted the business under the name of Eugene White & Co. (the company being nominal), until closed by these attachments. * * * There were no further transactions between us until the seventeenth of May. At this time he had my note for $500 and the $6,000 note. He said he wanted to

be protected in the $2,000, at the Exchange bank, that I had assumed. He had agreed to keep it running until I could pay it. He said the bank wanted the note paid or more security, and that he would have to get his father to go on it. Mr. Carlisle said to me on this occasion that I ought to protect him and protect myself, and there was only one way to do it. That was to make a deed of trust to cover the property. That would protect him and myself in case the eastern creditors jumped on me.    *    *    *

"*Q*. What did you owe him at that time? *A*. $2,650.

"*Q*. What did you give him the note for $4,000 for, when you only owed him $2,650? *A*. I gave him a note for $4,000 and owed him $2,650, and the understanding between us was that the $1,350 over and above the debt I owed him was to come back to me in case there was a foreclosure.

"*Q*. Was to come back to you, from whom? *A*. Mr. Carlisle.

"*Q*. Was that the agreement between you and him? *A*. Yes, sir; it was.

"*Q*. Did you execute the note and deed of trust? *A*. Yes, sir. The deed of trust was on my entire store, fixtures and books, accounts, etc. I gave the deed of trust on Saturday about noon, and the next day I found that if had been filed for record." This evidence of White's was flatly contradicted by Carlisle.

It further appeared from the evidence that the deed of trust was filed for record on the seventeenth of May, 1889. The petition in the suit against Eugene and Meade White on the $6,000 note was filed in the Audrain circuit court on the same day. And on the twentieth Carlisle wrote the following letter to the respondents:

"GENTLEMEN.—Please inform me by return mail whether or not the last order made of your firm by White & Carlisle, and subsequently assumed by Eugene White & Co., has been paid and oblige

"(Signed)                    J. A. CARLISLE."

To which he received an answer, dated May 23, that the account had not been settled; and afterwards received another letter from respondents, dated May 27, that they would look to him for payment of their account.

On the twenty-first of May Eugene White, Waugh, the trustee, and Carlisle entered into a written agreement, by which G. W. Trimble was placed in charge of the property conveyed by the deed of trust with power to conduct the business and apply the proceeds to the payment of the trust debt. On the twenty-fourth of May the creditors of Eugene White & Co. began filing suits by attachment. On the fourth of June, 1889, the suit of Carlisle against the White in Audrain county was dismissed, and in October Carlisle wrote the respondents the following letter:

"*Messrs. Alberger, Stoer & Co.*

"You are among the attaching creditors of Eugene White & Co., insolvent firm, late of this city. The net proceeds of receiver's sale under order of sale in attachment can not possibly exceed $4,000. The attaching creditors, dates of attachment and amounts sued on, are as follows:

C. M. White, May 24, $1,800 with interest....................$1,920 00
Columbia Savings Bank, May 24, $1,000 with interest.......... 1,060 00
Joseph M. Hays Woolen Co., May 24, $300.............. .....  300 00
Longley, Lowe & Alexander, May 28...................... ....  240 00
Longley, Lowe & Alexander, May 29.......................  170 00
John B. Ellison & Sons, May 30...................... ...... 1,350 00
Balm Bros. & Co., May 30....................................  260 00
Excelsior Laundry Co., May 31...............................  150 00
Alberger, Stoer & Co., May 31...................... ..........  580 00

"You will thus discover that about $5,400 must be paid out of $4,000 before a cent can be paid to you. The undersigned was a member of the old firm of White & Carlisle, to whom your above-named account was first charged, and who were predecessors in business to said Eugene White & Co. I shall be interested in each of said suits as interpleader for property attached. Your interest and mine in the suits are identical, if the original liability of White & Carlisle to you has not been discharged. If such be the fact, concerning which I do not commit myself, and my interest prevails you will enjoy the full benefit of my success. Owing to your present attitude in court, and consequent complication with other attaching creditors which I need not explain, I cannot now give you the facts from which your above-mentioned relations to me arise; but if you will in *honorable* confidence keep this statement from all persons here whomsoever, and send a man here with power to act, I can show him how your debt will be saved, whereas in the present condition of things it will certainly be lost. It is important for us both that you communicate with *me* directly and with *no one else*. If you send a man, send immediately and notify me of the fact when he will be here, as I live some distance in the country.

"Very respectfully,

"J. A. CARLISLE."

To which respondents replied on the seventh of October that their claim was in the hands of their attorneys and referring him to them.

The foregoing summary presents the salient features of the case presented by the evidence, on which, the court gave the following instructions for the respondents; of which the appellants complain of numbers 2, 3, 4 and 5 as erroneous:

"1. The court instructs the jury in this case that if they believe, from all the facts and circumstances admitted in evidence, it was agreed between the interpleader J. A. Carlisle and Eugene White, at the time the deed of trust and note of $4,000 were executed and delivered, a part of said amount of $4,000 was, when collected, to be paid back to said Eugene White, and thereby prevent his other creditors from getting such part, then said deed of trust and note are fraudulent and void, and your verdict must be for the plaintiff in the attachment.

"2. Although interpleader J. A. Carlisle had a legal right to take and receive a note, and have it secured by deed of trust on the property of Eugene White, for any *bona fide* debt or liability of said White to him, whether due or to become due, yet, if the jury believe that at the time of the execution of the note and deed of trust from White to Carlisle, offered in evidence, said White was largely indebted to other parties, and that said note was for a larger or greater amount than said White owned, or was liable to said Carlisle for, and both White and Carlisle knew that fact at the time of the execution and delivery of said note and deed of trust by White to Carlisle, then the note and deed of trust are fraudulent and void as to such creditors, and your verdict should be for the plaintiffs in the attachment.

"3. The jury are instructed that direct and positive evidence is not required to established or prove fraud, but it may be gathered or inferred from all the facts and circumstances *in this case*; and if the jury believe from all the facts and circumstances in evidence in this case, that Eugene White gave the note and deed of trust read in evidence, to James Carlisle with the intent to hinder, delay or defraud the said Eugene White's creditors, and that Carlisle had knowledge of such fraudulent intent, and aided or in any manner assisted

him (White) in carrying out said fraudulent intent, then your verdict must be for plaintiffs in attachment, to-wit, Alberger, Stoer & Co.

"4. The jury are instructed that, although they may believe from the evidence that the note and deed of trust read in evidence were executed by White to the interpleader, Carlisle, and that White, Carlisle and Waugh afterward executed an instrument of writing (read in evidence) to G. W. Trimble, authorizing him to take possession of the stock of goods levied upon under the writ of attachment issued in this cause, still, if the jury further believe from the evidence that said deed of trust and said other instrument of writing were made by White with the intent to hinder, delay or defraud the creditors of White in the collection of their debts, and that Carlisle knew of the purpose of White in making and executing said instrument, *and participated in such intent in any manner*, then such instruments were void as to the attaching creditors of White, whether said Carlisle had a valid debt secured by said deed of trust or not.

"5. If the jury believe from the evidence that Eugene White, defendant in the attachment, executed and delivered to interpleader James A. Carlisle the four-thousand-dollar note read in evidence, and the deed of trust conveying to James H. Waugh, as trustee, the said stock of goods, wares and merchandise in controversy in this case, with the intent or purpose to hinder, delay or defraud the creditors of said White, other than Carlisle, and that Carlisle had knowledge of, and participated in, such fraudulent intent, then the verdict of the jury must be for the plaintiffs in the attachment, to-wit, Alberger, Stoer & Co."

The foregoing statement of the case was made by Judge BRACE in division number one, and, being so

satisfactory, was, *in banc* by his consent, adopted by the court.

I. The interpleader complains only of instructions. The second instruction is challenged for the reason that he conceives it limited the right of the interpleader to "take and receive a note, and have it secured by deed of trust on the property of Eugene White, for any *bona fide* debt or liability of said White to him,—Carlisle," thereby excluding the right of interpleader, Carlisle, to take a note and deed of trust to secure himself against the old firm obligations of White & Carlisle.

Under the issues and facts in this case, this point is not well taken. The instruction referred to the evidence in the case. It covered fully the liability of White to Carlisle. This liability grew out of his assumption of the very firm debts which counsel claim were excluded by the instruction. The word was used to cover the contingent liability of Carlisle in case Eugene White should not discharge the firm obligations of White & Carlisle, which he assumed, and stand half of the losses on the firm accounts.

The sole issue was whether the note only included these *bona fide* obligations. The creditors claimed that White and the interpleaders had fraudulently included in the note a sum largely in excess of White's debt or liabilities growing out of his purchase of the said firm's assets. No other liabilities were under consideration, and there is not the slighest probability the jury construed the instruction in the way learned counsel claims they were authorized to do.

The instruction was pertinent and we think comprehensive enough to cover the issues on trial.

II. Learned counsel urges that in the third instruction the court invaded the province of the jury, usurped their functions and practically decided the case against the interpleader.

That instruction is as follows:

"3. The jury are instructed that direct and positive evidence is not required to establish or prove fraud, but it may be gathered or inferred from all the facts and circumstances in evidence in this case; and if the jury believe, from all the facts and circumstances in evidence in this case, that Eugene White gave the note and deed of trust, read in evidence, to James Carlisle, with the intent to hinder, delay or defraud the said Eugene White's creditors and that Carlisle had knowledge of such fraudulent intent and aided, or in any manner assisted him (White), in carrying out said fraudulent intent, then your verdict must be for plaintiffs in attachment, to-wit, Alberger, Stoer & Co." The criticism is that the court gave the jury his opinion that the facts and circumstances in *this* particular case, established fraud.

It may be conceded that a particular emphasis upon the article "the," and the clause, *"in this case,"* at first blush, are open to the construction now placed upon them by the appellants; but let us look at the instruction in another light. The court was instructing *in this case*, not another, and the jury were trying this case, not another. Let us transpose the clause, "in this case," and place it at the commencement of the instruction. It will then read: "In this case, the court instructs the jury that direct and positive evidence is not required to establish or prove fraud, but it may be gathered or inferred from all the facts and circumstances in evidence." Had it been in this last form, certainly it would have been authorized by repeated decisions of this court. *Burgert v. Borchert*, 59 Mo. 84; *Albert v. Besel*, 88 Mo. 154. But, reading it as it was given, has the court said more than this,—fraud *may be* shown by the facts and circumstances in evidence *in this* or any other case, where it is the issue. If it may so

show in any case, was it trenching upon the privileges of the jury to inform them they might so find in this case.

Clearly, if the trial court had considered that the facts were not debatable, and established fraud as a matter of law, he would not have submitted it to the jury to find it from the facts and circumstances. And, on the other hand, if there were no facts and circumstances from which fraud could properly be found in this case, it was error to submit it in any form to the jury. If there was evidence from which fraud might have been found—and this the interpleader does not controvert—then the jury were properly instructed that it was not necessary to prove the fraud by direct or positive evidence, but might so find it from the evidence in this case.

But the instruction is not to be declared erroneous by a hypercritical test of the first clause alone. This first part is but the reiteration of the law, in an abstract way, as to the amount and character of proof demanded in these cases, and following it, in the same immediate and direct connection, and coupled with it by the copulative conjunction, the jury are told that, if from all the facts and circumstances in evidence, *they*, the *jury*, not the court, shall find certain ultimate facts existed, then they must find for the attaching creditor; so that, when taken as a whole, the jury were simply authorized to find that Eugene White executed the note and deed of trust with the intent to delay, hinder or defraud his other creditors, from the facts and circumstances, and it was left for them to say whether they found and believed White was guilty of fraud and that Carlisle knew it, and, knowing it, aided or assisted him in any manner, in carrying out the fraudulent intent.

The meaning of this instruction must be gathered from it as a whole and not by critically separating it,

and then attacking the detached sections in detail. *State v. Matthews*, 98 Mo. 130; *Burdoin v. Trenton*, 116 Mo. 358. This is the rule for the construction of any writing or instrument, and we see no good reason why it should not be applied to an instruction drawn, often hurriedly, but whose meaning is rarely misunderstood. Had it been construed by the counsel for the attaching creditors, in the argument, as it is here by interpleader, we doubt not the interpleader would have had the court repudiate instantly the charge that he was assuming to find fraud for the jury.

So much for the verbal criticism. Let us see if the instruction is otherwise obnoxious to the principles of the law. The law, in cases similar to this, seems to be well defined, in this state. A creditor has a perfect right to take security for an honest debt from his debtor, although he may know that the effect of taking it will be to delay or hinder the other creditors of his debtor in the collection of their debts, and though he may also know that the debtor thereby intends to hinder, delay or defeat his other creditors, provided, always, the creditor so preferred does not participate in the fraudulent purpose or intent of his debtor. *Shelley v. Boothe*, 73 Mo. 74; *Holmes v. Braidwood*, 82 Mo. 610; *Albert v. Besel*, 88 Mo. 150; *Frederick v. Allgaier*, 88 Mo. 598.

Measured by these decisions, there can be no objection to this instruction. It recognizes fully interpleader's right to take security for his honest debt, even though he knew White was intending to defraud his other creditors; but it required that he should stop at securing his debt, and declared that if he did not, but went further and aided or assisted the fraudulent debtor in carrying out his fraudulent purpose, his preference so obtained should be avoided.

Some criticism is also indulged because of the use of the expression, "*in any manner assisted* in carrying out said fraudulent intent." Certainly one who assists another, *in any manner*, in carrying out a fraudulent purpose, is a *particeps criminis*. It is utterly immaterial what means he resorts to, if he invokes and adopts them to aid in the perpetration of a fraud, he forfeits thereby the countenance of the law, and is a joint fraud-feasor. It is his assistance in carrying out the fraud, that vitiates the whole of his security. *Sieger's Sons v. Thomas*, 107 Mo. 635. And it is quiet a different thing from honestly taking a security for the sole purpose of saving his own debt which may result in a delay of other creditors. *State ex rel. v. Hope*, 102 Mo. 410. We find no error in this instruction that would justify a reversal of this cause. *McGowan v. Ore & Steel Co.*, 109 Mo. 518.

III. The error assigned in the fourth instruction is that it enunciates a proposition legally and morally impossible. The instruction declares that, notwithstanding the jury should find that White executed the note and deed of trust to Carlisle, and that White, Carlisle and Waugh placed Trimble in possession of the goods attached in this case, still if the jury shall further find from the evidence that the said deed of trust and the instrument by which Trimble was put in possession were made by White with the intent to hinder, delay or defraud the creditors of White in the collection of their debts and that Carlisle knew of the purpose of White in making and executing said instrument *and participated* in such intent in any manner, then such instruments are void as against the attaching creditors of White, whether Carlisle had a valid debt secured by said deed of trust or not.

The instruction in all essential particulars is based on the same principles already discussed as to the third

instruction; but the specific error, it is claimed, is in holding that Carlisle could participate in the fraudulent intent of White. We do not know that we fully appreciate the point made. We do not see why two men may not have a common intent or purpose to do an unlawful or fraudulent act or commit a crime with common intent or purpose, and if so, why each may not be said *to participate in the other's intent.* In *Albert v. Besel*, 88 Mo. 150, Judge BLACK used this language: "They had a perfect right to buy the goods for that purpose, though the purchase might operate to hinder and delay the other creditors in the collection of their demands, and though to their knowledge Besel intended the sale should have *that effect, provided they did not participate in the fraudulent purpose of Besel.*"

In *Frederick v. Allgaier*, 88 Mo. 598–603, Judge SHERWOOD says, speaking of the difference between a creditor purchasing to save a debt or taking a security, and a purchaser who was not a creditor: "In the one instance *mere knowledge* on the part of plaintiff of Rhodes' fraudulent intent is sufficient to defeat his action; in the other he must have been a *participant in that fraudulent intent* in order to defeat his recovery." For an illustration we need not go beyond the facts of this case. It may have been,—indeed, it does not seem to be questioned,—that White honestly owed Carlisle something. This being true, Carlisle had a legal and moral right to the deed of trust given to secure that debt, but if he knew that White intended to delay, hinder or defraud his creditors and permitted White to include in the deed of trust, not only the debt which he might lawfully secure, but an amount in excess thereof, and agreed to account to White for this excess over his debt, then we say he was not only securing a lawful debt, but he went further, and *participated* in White's *fraudulent intent* to defeat his creditors.

Such transactions are not only not impossible morally or legally, but, unfortunately, are exceedingly common in every-day life. Says NORTON, J., in *Shelley v. Boothe*: "The right of a debtor to prefer one creditor over another necessarily implies the right of such creditor to accept such preference. While the effect of such preference must, to the extent that it is made, necessarily be to hinder or to delay other creditors, the mere knowledge of the preferred creditor that such will be its effect, and the debtor intended it should have that effect, will not be sufficient to avoid the transaction as to a creditor not preferred. But if in such case it further appears from the circumstances attending the transaction that the preferred creditor was not acting from an honest purpose to secure the payment of his own debt, but from a desire to aid the debtor in defeating other creditors, or in covering up his property, or in giving him a secret interest therein, or in locking it up in any way for the debtor's own use and benefit, he will not be protected; because in such a case the fraud of the debtor becomes the fraud of the preferred creditor, because of his participancy therein." *Shelley v. Boothe*, 73 Mo. 77.

In *Van Raalte v. Harrington,* 101 Mo. *loc. cit.* p. 612, BLACK, J. says: "It makes the vendee a participant in the fraudulent purpose of the vendor," etc.

In *State ex rel. Robertson v. Hope*, 102 Mo. 428, BRACE, J. *arguendo*, says: "If the creditor is guilty of fraud it is because he is a participant in the fraudulent intent of the debtor."

Whatever difficulty counsel may have in solving this mental proposition, it is one that seems never to have given the different members of this court trouble, nor do we think the bar generally regard it as unsolveable or impossible.

Regarding this instruction as in line with the established law in this state, and there being no error in the record, the judgment is affirmed. BARCLAY, BURGESS and SHERWOOD, JJ., concur; BLACK, C. J., BRACE and MACFARLANE, JJ., dissent.

BRACE, J. *(dissenting)*.—1. The criticism on instruction number 2 is that it limits the right of the interpleader, Carlisle, "to take and receive a note and have it secured by deed of trust on the property of Eugene White for any *bona fide* debt or liability of said White to him" (Carlisle), thereby excluding the right of the said Carlisle to take a note and deed of trust embracing liabilities of the old firm of Carlisle & White to third parties. We do not think this a fair construction of the instruction. It was conceded that the whole consideration of the $4,000 note, except White's original note of $500 and interest, and the money which Carlisle had loaned him from time to time amounting to $160.85, about which there was no dispute, consisted of losses on the accounts of White & Carlisle assigned to the latter, one-half of which White was to pay, and liabilities of that concern to third parties, which White had assumed, and of these liabilities there was no dispute about the item of $2,000, due the Exchange bank and interest. So that the whole matter in dispute was the *bona fides* of the liabilities of White to Carlisle on account of the losses on the assigned accounts and the liabilities of the old firm to third parties, which White in his contract with Carlisle had assumed to pay, and which the interpleaders claim went to make up the remainder of the consideration of the note. This was the issue to which the evidence was directed.

These were the only liabilities about which there was any dispute. These were evidently the liabilities to which the instruction referred, and the jury could

not well have understood the expression "any *bona fide* debt or liability of White to Carlisle" or the expression "said White owed or was liable to said Carlisle for," otherwise than as referring directly to those liabilities which were the "bone of contention."

2. The objection to instruction number 3 is more serious. For, by this instruction, the jury are, in effect, told that fraud in fact, on the part of Carlisle, may be inferred from all the facts and circumstances of the case, provided they find that Eugene White gave the note and deed of trust with intent to hinder, delay or defraud his creditors and Carlisle had knowledge of such fraudulent intent and *in any manner* assisted White in carrying out such intent. The settled law in this state is that a creditor is not deprived of the right to secure the payment of an honest debt, by taking a security therefor that may have the effect of hindering or delaying other creditors, although he may know that the motive that prompts his debtor is not alone to give him the preference, but is coupled with an ulterior one to hinder and delay such other creditors or even to defeat the collection of their debts. *Sexton v. Anderson,* 95 Mo. 373; *Albert v. Besel,* 88 Mo. 150; *Holmes v. Braidwood,* 82 Mo. 610; *Shelley v. Boothe,* 73 Mo. 74.

His taking the security may assist his debtor in accomplishing his purpose as to such creditors, but unless he himself has the same purpose, and does some act towards its accomplishment, he is not guilty of a fraud that will vitiate his security, and the question whether he took the security with such guilty purpose on his part, is a question of fact for the jury, whose province the court invaded *in this case,* when it told them that the facts and circumstances of the case were such as to warrant the inference of fraud. That was an inference that the jury should have been left at liberty to draw or not to draw, according to their own

appreciation of the facts and circumstances in the case under their consideration.

3. Instruction number 4 was calculated to mislead the jury. Under its direction, although the jury may have found that Carlisle took the note and deed of trust for the purpose of securing an honest debt, and did no other act calculated to hinder or delay White's other creditors, yet, if they found that White's purpose in executing the securities was to hinder, delay or defeat his other creditors, and that Carlisle knew it, and "participated in such intent in any manner," then his securities are void; and in the fifth instruction repeating this hypothesis, the jury are told in such case to find for the attaching creditors. These instructions should not have been given. They are erroneous in themselves and were well calculated to confuse the minds of the jurors and distract their attention from the real issues in the case, which were fairly well presented in the first two instructions given for the respondents. They present the solecism of a man guilty of no fraudulent act, yet guilty of fraud, by reason of some sort of occult participation in the fraudulent intent of another. We can understand how two minds can be said to participate in a fraudulent act, if such act be the joint product of a fraudulent purpose upon the part of each, and how each should be held responsible for the fraud. But it is impossible to conceive, except perhaps upon some principle of hypnotism or clairvoyance (of which we are not well advised) how one mind can participate in the *intent* of another, or how a person, committing no fraudulent act can become vicariously responsible for the fraudulent act of another by some sort of undefined participation not in the fraudulent act but in the fraudulent intent of that other person. The law holds no man responsible

Vol. 117—24

for the intentions of another, nor even for his own intentions until they bear fruit in action.

If Carlisle, in taking White's promissory note for $4,000 and the deed of trust, knowingly included an amount in excess of White's actual liabilities to him, direct and contingent, either for his own benefit, or as a secret trust for White, he was guilty of a fraud, upon White's other creditors that would vitiate his security as to them, and the respondents ought to have recovered. In the first two instructions for the respondent the jury were in effect so told by the court. After covering the real issues in the case by these instructions the court erred in going beyond and suggesting to the jury in the last two that, although they might not find that Carlisle committed this fraud, they might find for the respondents on account of some sort of fraud that might be imputed to him through the intention of White.

It is impossible to say whether the verdict was the result of the jury's conviction that Carlisle was actully guilty of the fraud defined in the first two instructions, and in issue in the case, or of some vague, suppositious fraud that seemed to be shadowed forth in the last two, or of some like fraud that they were told in the third instruction they were authorized to infer. In such case the only proper course to pursue is to reverse the judgment and remand the cause for new trial.

In these views BLACK, C. J. and MACFARLANE, J., concur.